## Darreff Estate

Before Klein, A. J., Saylor (Specially Sitting), Shoyer, Bruno, Pawelec and Silverstein, JJ.

SAYLOR, J., December 31, 1973.—This trust arose under deed of trust of Dennis A. Darreff and Edith, his wife, dated June 1, 1965, and was the successor to an agency account which the settlors had previously established with the Frankford Trust Company.

By the terms of the deed, the settlors transferred to the Frankford Trust Company certain stocks and bonds, cash and real estate in trust, with limited responsibility during the "stand-by" period, and with full responsibility when so notified, to hold and manage, and to apply as much of the net income and principal as the trustee in its discretion might deem advisable for the support and welfare of the settlors and the survivor of them, and of their immediate family, and upon the death of the survivor of the settlors, to pay over the balance of principal and income to the personal representative of the estate of such survivor.

Shortly after the deed was executed, Mrs. Darreff was hospitalized for surgery, and on July 30, 1965, pursuant to notice as provided in the deed, the trustee assumed full responsibility.

Edith M. Darreff died on August 22, 1965, survived by her husband, Dennis A. Darreff, for whom the trust continued.

Dennis A. Darreff thereafter died on January 13, 1971, a resident of Ocean City, N. J., leaving a will dated May 22, 1964, which was duly admitted to probate in the Surrogate's Court of Cape May County on February 1, 1971. By the terms of his will, his entire estate passes to his daughter, Marie E. Morrow, by reason of the prior death of his wife. He appointed the Frankford Trust Company as executor.

On March 29, 1972, Marie E. Morrow commenced an action in equity in the United States District Court for the Eastern District of Pennsylvania against the

Frankford Trust Company, as trustee, to compel an accounting of the trust from its inception on June 1, 1965, to January 13, 1971, the date of death of Dennis A. Darreff, the survivor of the settlors. On May 23, 1972, the trustee filed its account in this court, and thereafter the United States District Court (Huyett, J.) citing the opinion of the Third Circuit Court of Appeals filed July 27, 1972, in Reichman v. Pittsburgh National Bank, 465 F. 2d 16, entered an order on September 7, 1972, dismissing the action in the District Court with prejudice.

The accounting now before the court for audit covers the period June 1, 1965, to January 13, 1971, and was filed by reason of the death of Dennis A. Darreff.

At the hearing on October 16, 1972, counsel for Marie E. Morrow stated that "[W]e believe that this is an accurate accounting," and since no evidence to the contrary was offered, the court concludes that the account is accurately stated. Mrs. Morrow, however, disputes the validity of the trust, and has asserted various complaints with respect to its administration which resulted in some 700 pages of testimony taken at several hearings extending over a considerable period of time.

Her complaints would seem to fall into three categories: (1) that the trust is invalid because the corpus was not sufficiently identified, and further, that the settlor, Dennis A. Dareff, lacked the mental capacity to create the trust; (2) that the terms of the trust did not give the settlors maximum death tax advantages in the ultimate disposition of their estates; and (3) that the trust was not managed for the best interests of the beneficiaries.

(1) As to the validity of the trust. Marie E. Morrow complains (a) that the corpus of the trust was not

sufficiently identified in the deed, and (b) that her father was mentally incompetent when the trust was created. For these reasons, she contends that the court should decree the trust void ab initio.

The trust res was sufficiently identified and was definitely ascertainable from the facts existing at the time the deed was executed. About a year before the trust was created, the Darreffs consulted the Frankford Trust Company concerning the management of their investments. Mr. Darreff was 88 years of age, but physically well. Mrs. Darreff was 77, but in poor health; she was suffering from diabetes. When the trust officer, Clayton B. Kraiss, explained that the bank could manage their investments as agent, subject to their direction, the Darreffs decided to have the bank do so.

By letter dated May 22, 1964, the Darreffs authorized the bank '"[T]o service various securities now registered in either of our names or jointly as well as future purchases of securities that may be made by us or by Frankford Trust Company upon our authorization," and to remit the income to the Darreffs "on a mutually agreeable basis," and pay bills upon their authorization. For its services, the Darreffs agreed that the bank should receive fees of one-half of one percent to be calculated on the total value of the account annually.

Upon this understanding, the Darreffs removed their securities from their joint safe deposit box and delivered them to the trust department of the bank. The bank gave them a formal itemized receipt dated May 27, 1964, identifying the securities in detail and then had the stocks registered in the name of Shenkel & Company, its nominee.

Mrs. Darreff's physical condition worsened and about a year later the Darreffs decided to convert the

agency account into an inter vivos trust. The Darreffs engaged the law firm of Moore, James, Wright & Gibbons to prepare the trust instrument, and on June 1, 1965, the deed was executed by the Darreffs at their residence under the supervision of Edward Gibbons, Jr., Esq. Under the "stand-by" provisions of the deed, the duties of the bank as trustee were similar to its duties as agent. On July 30, 1965, as previously stated, the bank was notified to assume full responsibility as trustee.

During the period of the agency account, the Darreffs made very few changes in their investment portfolio. A few stocks and bonds were sold and with the proceeds they authorized the bank to purchase United States Treasury obligations. Several stock dividends were received, and also a stock-split of 466 shares American Telephone & Telegraph Company. The monthly statements which the bank furnished the Darreffs itemized the securities in the agency account with current values, and the statement of May 25, 1965, immediately before the trust was created listed securities of the value of $661,-760.85 and real estate of the value of $62,500.

In the deed of trust it is recited that the "settlors have transferred to trustee certain property listed in Schedule A," but no schedule A is attached to the deed, and, because of this omission, Marie E. Morrow contends that the corpus of the trust is not sufficiently identified. She would have the court ignore the fact that the assets listed in the bank's statement of May 25, 1965, and in the bank's possession are identical with the assets listed in the account which she admits is accurately stated. There is no merit in her contention. The trust res was in the possession of the trustee at the time the trust was created and its identity was definitely ascertainable from the facts then existing. The court so finds.

When the Darreffs executed the deed of trust on June 1, 1965, Mr. Darreff was 89 years of age and Mrs. Darreff was 78. Mrs. Darreff was ill and confined to her bedroom, but all agree that she was mentally alert and sound. All likewise agree that Mr. Darreff was physically well. Mrs. Morrow, however, contends that her father was senile when he executed the deed and not competent to create the trust. She testified that he would hide checks; that he would turn off the heat; that he did not know the time of day, the month, or the year; and that this condition continued until his death on January 13, 1971.

By way of corroboration, two of her children testified. Her son, Robert, testified that he visited his grandfather in December 1963, and again in August 1965 when his grandmother died, and that on both occasions he found it difficult to converse with his grandfather. He said he tried to discuss sports and politics, but Mr. Darreff showed no interest.

Another son, John, testified that he too visited his grandfather in 1963 and that he had difficulty in discussing sports and politics.

Several of the nurses who attended Mrs. Darreff in her last illness were called to testify concerning their observations of Mr. Darreff. All agreed that he was in good health physically. He would bathe and shave in the morning, have breakfast, and would sit on the sofa with his dog, read the newspaper or watch the traffic. Sometimes he would have the newspaper upside down. At other times he would inquire again about breakfast, having forgotten that he already had his breakfast. However, he could sign checks. The testimony of these witnesses was general in nature, and none of it applied to Mr. Darreff's mental condition on the day the deed was executed or within any reasonable time before or after its execution.

Mrs. Morrow's efforts to nullify the trust is incongruous with other transactions which she affirms. She does not challenge the validity of her father's will which was executed on May 22, 1964, and under which she takes his entire estate. While she testified that her father's senility continued until his death on January 14, 1971, she had no qualms about accepting a check on September 11, 1965, for $10,000, or another on December 18, 1965, for $4,514.91 to purchase an automobile, or another on March 12, 1966, for $10,000, or another on April 28, 1966, for $8,775.64. All of these checks were signed by Mr. Darreff. Nor did she interpose any objection in March 1968, when Mr. Dareff borrowed some $80,000 from the commercial department of the Frankford Trust Company to build a new home for their joint occupancy and the use of her family.

Mrs. Morrow testified that her mother telephoned her in Ohio in 1965 and informed her of the trust agreement, and that Mr. Rogers explained the terms of the deed to her when she came to Philadelphia in August 1965, and that "I was very much in agreement with it at that time." Indeed, by virtue of the trust, she received during the five and one-half years of its existence income of over $106,000 for the support of her father, herself and her family. These payments continued for some six years, yet she never questioned the validity of the trust until after her father's death. No valid excuse for such inaction or lack of diligence appears in the record.

The mental competency of a person who executes a written instrument is presumed and the burden of proof is upon the person who alleges incompetency. Lasky v. Paprocki, 363 Pa. 50. The initial burden of proof, therefore, was upon Mrs. Morrow, and the evidence submitted does not measure up to the standard of proof required to set aside the deed. Such

evidence must be clear and convincing: Sechler v. Sechler, 403 Pa. 1.

Respect for the integrity of written instruments requires that they should not be set aside unless there is convincing evidence that the person who executed them lacked the mental capacity at the time to do so or was subjected to fraud or undue influence: Jones v. Schaefer, 357 Pa. 628; Jenne v. Kennedy, 379 Pa. 555. In the face of undisputed facts, the auditing judge is not convinced that Mr. Darreff lacked the capacity to create the trust. On the contrary, I find from the evidence that he had sufficient ability to understand and appreciate the nature of the trust instrument and its effect.

(2) As to death taxes. Mrs. Morrow complains that the trust which the settlors created did not give them, or their estates, maximum death tax advantages. It appears that the trust assets originally belonged to Mr. Darreff, and Mrs. Morrow contends that he should have been advised to give one-half of his property to his wife and that they should have created separate trusts for the benefit of each other with remainders over to Mrs. Morrow. Her plan, of course, presupposes the willingness of her father to do so. On the other hand, the trustee points out that such a plan would have immediately generated a gift tax and could not be wise because of Mr. Darreff's advanced age. Moreover, upon the death of Mrs. Darreff, the assets in her separate trust would have been subjected to inheritance and Federal estate taxes.

It is not the function of this court to determine whether the settlors availed themselves of maximum tax advantages. At the time the trust was created, they were represented by competent counsel and there is no evidence in the record of what advice they sought or received. It was the function of counsel to

advise the settlors, and not the function of the trustee. The trustee performed its full duty when it administered the trust in accordance with the provisions of the deed.

(3) As to the management of the trust. Mrs. Morrow complains that the trustee improperly registered the securities in the name of its nominee. There is no merit in her complaint. While the Frankford Trust Company was acting as the settlors' agent prior to the creation of the trust, Mr. Darreff himself transferred all the securities to Shenkel & Company, the bank's nominee, for facility of management. When the trust was created on June 1, 1965, they so remained. In Item V(2) of the deed, it is expressly provided: "Trustee is authorized to register all securities in the name of its nominee."

Mrs. Morrow complains that the trust should have produced a higher income yield. I find from the evidence that the income produced was average for trust funds. Including dividends payable in stock and attributable to income, the trust averaged 4.06 percent. Moreover, principal appreciated over $70,000. It was the duty of the trustee to administer the trust with due regard for principal as well as for income. To increase the income yield would have required the trustee to convert settlor-owned securities and incur a substantial capital gains liability at the expense of principal. Such conversions were deemed unwise in view of Mr. Darreff's advanced age and the fact that the trust income was more than sufficient for his needs.

Mrs. Morrow complains that the trustee did not dispose of 912 shares of its own stock which Mr. Darreff had acquired over the years. When the trust was created in June 1965, these shares had an account value of $89,376 and a cost basis to Mr. Darreff of

$14,710. Had the shares been sold when the trust was created, the trust would have realized a capital gain of $64,166 which would have generated a capital gains tax of $18,666.50. By retaining the shares, the trust received 456 additional shares in stock dividends and when Mr. Darreff died on January 13, 1971, the trust held 1,368 shares which had a current value of $136,116. Meanwhile, the investment produced an average income yield of 2.4 percent. Consequently, instead of diminishing principal by payment of a capital gains tax of $18,666, the trust has a potential gain of $46,740.

In March 1968, Mr. Darreff and Mrs. Morrow informed the trustee that they planned to build a new home in Ocean City, N. J., and inquired how to best raise $80,000 for the purpose. Edie & Company, the trustee's investment counselor, suggested the sale of certain stocks, but, upon further consideration, the trustee advised that it would be more advantageous to borrow the money and pledge the trust assets as collateral. In a letter to Mrs. Morrow dated March 29, 1968, Mr. Kraiss explained in detail the relative advantages and disadvantages of a loan and Mr. Darreff and Mrs. Morrow expressly approved the trustee's recommendation that a loan be obtained. Mr. Darreff then negotiated a loan with the commercial department of the Frankford Trust Company. Mrs. Morrow now complains that it would have been more advantageous if the trustee had liquidated certain stocks to raise the money, since the interest on the loan exceeded the income from the securities.

Again, the trustee points out that the sale of the stocks proposed to be sold to finance the house would have incurred a substantial capital gains tax, whereas the stocks increased some $16,000 in value as of the date of Mr. Darreff's death. In short, for the

slight difference between the interest paid on the loan and the dividend income from the stocks, the trust not only avoided a capital gains tax of some $12,000 but has a potential gain in principal of $16,-000. Having expressly approved the loan in 1968, with full knowledge of all material facts, Mrs. Morrow may not now complain that the transaction was inadvisable.

### *Trustee's Compensation and Counsel fees*

The personal assets administered by the trustee have an account value of $661,667 and the real estate was carried at $62,500, or a total of $724,167. Ordinarily, absent the settlor's compensation agreement, the trustee's commissions on principal at the usual rates on a graduated percentage would have been approximately $22,850 on personal estate and $625 on unconverted real estate, or a total of $23,475: Wallis Estate, 421 Pa. 104. Income actually collected during the term of the trust amounted to $181,172.56, and commissions on income, at the usual rate of five percent, would have amounted to another $9,000. Combined, the trustee's commissions on principal and income, except for the settlors' compensation agreement, would have been approximately $32,475. Under the compensation agreement the commissions charged in the account are slightly in excess of $21,-500.

Where a settlor in writing provides what the trustee's compensation shall be for its services, such provisions are binding on all parties concerned: Hays Estate, 183 Pa. 296; Fox's Estate, 235 Pa. 105; Constable's Estate, 299 Pa. 509.

Finally, Mrs. Morrow objects that neither the trustee nor its counsel has any right to compensation, since

the trust was void from its inception and was poorly managed by the trustee. Having found that the deed of trust is valid and that the trust was properly administered, the court likewise finds that there is no merit in Mrs. Morrow's objection. Counsel for the accountant requests compensation of $7,500 and has submitted a statement of services in support of the claim. Considering the work performed, the character of the services rendered, the difficulty of the problems involved, the importance of the litigation, the value of the property in question, the responsibility incurred, and the professional skill required, the auditing judge concludes that compensation of $7,500 is reasonable and just, and it is allowed: LaRocca Estate, 431 Pa. 542.

The accountant engaged the services of one Timothy Lingg, a former trust officer, to testify in rebuttal to the various objections raised by Mrs. Morrow. The witness was in court throughout the entire trial and testified at length in defense of the trustee's administration of the trust. In addition, he testified that he reviewed the account and spent considerable time familiarizing himself with the facts and circumstances relative to the various questions raised by Mrs. Morrow. For his services, he requests $1,000 compensation and the trustee asks that it be allowed. It is well settled that whenever there is an unsuccessful attempt by a beneficiary to surcharge a fiduciary, the latter is entitled to an allowance out of the estate to pay for counsel fees and necessary expenditures in defending himself against the attack: Wormley Estate, 359 Pa. 295. The compensation requested by Mr. Lingg is allowed.

I find no merit in any of Mrs. Morrow's objections either as to the validity of the trust or its administration, and they are all dismissed.

The account shows a balance of principal personal estate of $635,375.11 from which the following expenses are allowed:

Clerk of Orphans' Court Division, filing account, 275.00
Transcript of notes of testimony 496.30     771.30
leaving a balance of $634,603.81 of which $7,500 is awarded to Wright, Thistle & Gibbons, Esqs., compensation as counsel for account; $1,000 to Timothy Lingg, compensation for his services; and the balance, composed as indicated, is awarded to Frankford Trust Company, executor of the estate of Dennis A. Darreff, deceased.

It appears from the account that the balance of income of $192,301.65 has been fully distributed. Any additional income accrued to date of payment is awarded to Frankford Trust Company, executor of the estate of Dennis A. Darreff, deceased.

All awards herein to be subject to all payments heretofore properly made on account of distribution.

Payment and distribution is so decreed, and leave is hereby granted to the accountant to make all necessary transfers and assignments.

And now, December 31, 1973, the account is confirmed nisi.

*Edward Gibbons, Jr.,* and *H. Kenneth Tull,* of *Wright, Thistle & Gibbons,* for the accountant.
*Benjamin Dresnin,* for next of kin.

## SUR EXCEPTIONS TO ADJUDICATION

PER CURIAM, May 2, 1974.—We are all of the opinion that the exceptions filed by Marie Edith Morrow, settlor's daughter, are completely without merit.

We have examined the record in this case carefully and are fully satisfied that Frankford Trust Company administered this trust intelligently, honestly, faithfully and to the advantage and best interest of the settlors and the exceptant.

Little can be profitably added to what the learned auditing judge has said so well in his comprehensive adjudication. Accordingly, the exceptions are all dismissed and the adjudication is confirmed absolutely.